UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

TROY JACKSON,

       Plaintiff,

v.                                        Case No. 3:18-cv-1041-J-34JBT

CORIZON HEALTH, INC.,

       Defendant.

_____

## **ORDER**

### I.    **Status**

Plaintiff Troy Jackson, an inmate of the Florida penal system, initiated this action by mailbox rule on August 23, 2018, by filing a pro se Civil Rights Complaint under 42 U.S.C. § 1983 (Doc. 1). Jackson is proceeding on a second amended complaint (Second Amended Complaint; Doc. 4). In the Second Amended Complaint, Jackson names Corizon Health, Inc. as the sole defendant. According to Jackson, Corizon was deliberately indifferent to his serious medical need in violation of the Eighth Amendment. In addition, Jackson asserts that Corizon is liable for several intentional torts under Florida law. As relief, Jackson seeks monetary damages and declaratory relief.

Before the Court is Corizon's Motion for Summary Judgment (Motion; Doc. 61). In support of the Motion, Corizon relies on the following documents they previously filed with the Court (Mot. Exs.):  (A) portions of the Florida Department of Corrections medical and grievance records of Plaintiff Troy Jackson, Doc. 17-1; and (B) Corizon's answers to Jackson's interrogatories and Jackson's responses to requests for admission Corizon served on Jackson on November 14, 2019, Doc. 60-1. Jackson filed a response to the

Motion. See Plaintiff's Opposition to Defendant Corizon Health, Inc.'s Motion for Summary Judgment (Response; Doc. 80). Jackson submitted the following exhibits along with his Response (Resp. Exs):   (A) ambulance report; (B) emergency transfer report; (C) complaints against nurse Cynthia Lewis; (D) Corizon FL CMA on site signature sheet training phase 1; (E) Corizon corrective action template on nurse Lewis; (F) FDOC emergency procedures skills checklist; (G) Lewis' job summary; (H) Lewis' license verification; (I) Lewis' resignation from Corizon Health, Inc.; (J) complaint against Lewis filed with the Florida Department of Health; (K) Jackson's hospital documents from intensive care unit; (L) Jackson's mental health evaluation and treatment form; (M) court orders dismissing previous federal lawsuits; (N) Jackson's grievance response log number 1508-027; (O) Jackson's sworn affidavit; (P) declaration of Charles Pugh, M.D.; (Q) deposition of Charles Pugh, M.D.; (R) Southern Poverty Law Center report; (S) case law. Corizon filed a brief in reply. See Defendant Corizon Health, Inc.'s Reply Memorandum in Support of its Motion for Summary Judgment (Reply; Doc. 83). The Motion is ripe for review.

## II.      Jackson's Allegations

In his Second Amended Complaint, Jackson, who has been diagnosed with chronic asthma, alleges that on June 27, 2015, while incarcerated at Columbia Correctional Institution, he started experiencing shortness of breath at approximately 3:00 a.m. Second Amended Complaint at 6. Ten minutes later, Jackson alerted correctional officer Roebuck that he was having a medical emergency and Roebuck contacted the prison's medical unit, which included Nurse Cynthia Lewis. Id. at 6-7. Lewis came to Jackson's housing unit and took Jackson, by wheelchair, to the infirmary where she

checked Jackson's oxygen level at 3:25 a.m. Id. at 7. About five minutes later, Lewis administered an inhalation of nebulized Duoneb in conjunction with a Solumedrol injection. Id. Approximately three minutes after receiving this treatment, Jackson "lapsed into respiratory failure, and lost consciousness." Id. According to Jackson, instead of performing emergency medical care to resuscitate him, Lewis panicked and exited the infirmary. Id. The medical security officer, Officer Landig, rushed out of the room in an attempt to get Lewis to return and between approximately 3:33 a.m. and 3:35 a.m. he contacted the prison's control room and advised them of Jackson's situation and the need for immediate medical attention. Id. at 7-8. Jackson maintains that Lewis made a telephone call to the on-site physician to "presumably" get instructions or permission to send Jackson to an off-site emergency room. Id. at 8.

Roebuck had overhead the situation on his radio and rushed to the infirmary to give assistance. Id. Roebuck inquired with Lewis about whether she would be giving Jackson cardiopulmonary resuscitation (CPR). Id. According to Jackson, Lewis was agitated and upset and told Roebuck she would not administer CPR, at which point Roebuck started searching for an Ambi-bag. Id. at 8-9. Jackson avers that Lewis was in shock and unable to assist Roebuck with the search for the Ambi-bag. Id. at 9. Eventually, Roebuck found the Ambi-bag and administered CPR to Jackson and Jackson began to breath again. Id.

Jackson alleges that at 4:08 a.m., he again went into acute respiratory failure, but Lewis refused to perform CPR or provide other medical assistance. Id. At 4:13 a.m., Landig contacted the control room to request an ambulance and then requested the licensed practical nurse, Shiver, to report to the infirmary to assist Jackson. Id. Roebuck

again administered CPR to Jackson. Id. At 4:27 a.m., an ambulance arrived, and paramedics took over the resuscitation efforts. Id. The paramedics revived Jackson, but he remained unconscious. Id. at 10. Ultimately, the paramedics transported Jackson to a hospital and then transported him to a second hospital. Id.

While at the hospital, Jackson contends that a doctor diagnosed him with "severe asthma exacerbation, post acute hypercapnic respiratory failure with ventilator support, and hypertension." Id. Jackson remained at the hospital from June 27, 2015, to June 29, 2015. Id. Thereafter, Jackson was transferred to the North Florida Reception and Medical Center where he stayed from June 29, 2015, through July 7, 2015, and later transferred back to Columbia on July 28, 2015. Id. Once back at Columbia, Jackson asserts that he asked Lewis why she did not perform CPR, to which she responded that her CPR certification had expired, and she did not want to be liable if something went wrong. Id. at 11. Jackson also asked Lewis why she waited almost half an hour before calling the prison physician or an ambulance. Id. According to Jackson, Lewis replied that:

> The reason why I did not immediately send you to the emergency room when you went into respiratory failure, because [sic] we are instructed to find alternative treatment options that is [sic] cost efficient then to send an inmate to an outside hospital, and if there's no other options available, to contact the on-call physician for approval to send an inmate to the hospital.

Id. As a result of this incident, Jackson alleges that he "suffered a drastic lung deterioration and air flow capacity, as well as substantial loss of memory." Id. at 12. Jackson maintains that prior to this incident he used to blow between 600 to 700 on a peak flow meter, but now he blows between 200 to 320. Id. Jackson argues that Lewis' conduct "was largely attributable to the execution of Defendant Corizon's policies,

4

customs and practices to delay or minimize emergency room visits or discharge transfer to hospital to avoid costs and save money." Id. at 13. To that end, Jackson contends that Corizon was deliberately indifferent to his serious medical need (Counts One and Three) and failed to properly train Lewis (Count Two). Id. at 13-16. Jackson also alleges state law torts of intentional infliction of emotional distress (Count Four), medical negligence (Count Five), and negligent hiring, retention, or supervision (Count Six). Id. at 16-18.

## III.   Summary Judgment Standard

Rule 56 instructs that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Rule 56(c)(1)(A).[1] An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913,

---

[1] Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions." Rule 56 advisory committee's note 2010 Amends.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id. "[A]lthough the interpretations in the advisory committee['s] notes are not binding, they are highly persuasive." Campbell v. Shinseki, 546 F. App'x 874, 879 n.3 (11th Cir. 2013). Thus, case law construing the former Rule 56 standard of review remains viable and applies here.

919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When the non-moving party bears the burden of proof on an issue at trial, the moving party need not 'support its motion with affidavits or other similar material negating the opponent's claim,' Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986), in order to discharge this initial responsibility." Gonzalez v. Lee Cty. Hous. Auth., 161 F.3d 1290, 1294 (11th Cir. 1998). Instead, the moving party simply may demonstrate "that there is an absence of evidence to support the nonmoving party's case." Id.

"When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593–94 (11th Cir. 1995) (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party

opposing summary judgment." <u>Haves v. City of Miami</u>, 52 F.3d 918, 921 (11th Cir. 1995) (citing <u>Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro</u>, 38 F.3d 1571, 1578 (11th Cir. 1994)).

Of course, "pro se pleadings are held to a less stringent standard than pleadings drafted by attorneys and will, therefore, be liberally construed." <u>Tannenbaum v. United States</u>, 148 F.3d 1262, 1263 (11th Cir. 1998). However, "a pro se litigant does not escape the essential burden under summary judgment standards of establishing that there is a genuine issue as to a fact material to his case in order to avert summary judgment." <u>Brown v. Crawford</u>, 906 F.2d 667, 670 (11th Cir. 1990). Although courts show leniency to <u>pro se</u> litigants, courts "will not serve as de facto counsel or 'rewrite an otherwise deficient pleading in order to sustain an action.'" <u>Nalls v. Coleman Low Fed. Inst.</u>, 307 F. App'x 296, 298 (11th Cir. 2009) (quoting <u>GJR Invs., Inc. v. Cnty. of Escambia</u>, 132 F.3d 1359, 1369 (11th Cir. 1998)).

## IV.    Eighth Amendment Standard

Pursuant to the Eighth Amendment of the United States Constitution, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. The Eighth Amendment "imposes duties on [prison] officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" <u>Farmer v. Brennan</u>, 511 U.S. 825, 832 (1994) (quoting <u>Hudson v. Palmer</u>, 468 U.S. 517, 526-27 (1984)). "To establish an Eighth Amendment violation, a prisoner must satisfy both an objective and subjective inquiry regarding a prison official's conduct." <u>Oliver v. Fuhrman</u>,

739 F. App'x 968, 969 (11th Cir. 2018) (citing Chandler v. Crosby, 379 F.3d 1278, 1289

(11th Cir. 2004)). The Eleventh Circuit has explained:

> Under the objective component, a prisoner must allege a condition that is sufficiently serious to violate the Eighth Amendment. Id. The challenged condition must be extreme and must pose an unreasonable risk of serious damage to the prisoner's future health or safety. Id. The Eighth Amendment guarantees that prisoners are provided with a minimal civilized level of life's basic necessities. Id.
>
> Under the subjective component, a prisoner must allege that the prison official, at a minimum, acted with a state of mind that constituted deliberate indifference. Id. This means the prisoner must show that the prison officials: (1) had subjective knowledge of a risk of serious harm; (2) disregarded that risk; and (3) displayed conduct that is more than mere negligence. Farrow v. West, 320 F.3d 1235, 1245 (11th Cir. 2003).

Id. at 969-70. "To be cruel and unusual punishment, conduct that does not purport to be

punishment at all must involve more than ordinary lack of due care for the prisoner's

interests or safety." Whitley v. Albers, 475 U.S. 312, 319 (1986).

As it relates to medical care, "[t]he Supreme Court has interpreted the Eighth

Amendment to prohibit 'deliberate indifference to serious medical needs of prisoners.'"

Melton v. Abston, 841 F.3d 1207, 1220 (11th Cir. 2016) (quoting Estelle v. Gamble, 429

U.S. 97, 102 (1976)). The Eleventh circuit has explained that

> To prevail on a deliberate indifference claim, [a plaintiff] must show: "(1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1306-07 (11th Cir.2009). To establish deliberate indifference, [a plaintiff] must prove "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence." Townsend v. Jefferson Cnty., 601 F.3d 1152, 1158 (11th Cir.2010) (alteration in original). The defendants must have been "aware of facts from which the inference

8

> could be drawn that a substantial risk of serious harm
> exist[ed]" and then actually draw that inference. Farrow v.
> West, 320 F.3d 1235, 1245 (11th Cir.2003) (quotation
> omitted).

Easley v. Dep't of Corr., 590 F. App'x 860, 868 (11th Cir. 2014). "For medical treatment

to rise to the level of a constitutional violation, the care must be 'so grossly incompetent,

inadequate, or excessive as to shock the conscience or to be intolerable to fundamental

fairness.'" Nimmons v. Aviles, 409 F. App'x 295, 297 (11th Cir. 2011) (quoting Harris v.

Thigpen, 941 F.2d 1495, 1505 (11th Cir.1991)); see also Waldrop v. Evans, 871 F.2d

1030, 1033 (11th Cir. 1989) ("Grossly incompetent or inadequate care can constitute

deliberate indifference, as can a doctor's decision to take an easier and less efficacious

course of treatment" or fail to respond to a known medical problem). However, the law is

well settled that the Constitution is not implicated by the negligent acts of corrections

officials and medical personnel. Daniels v. Williams, 474 U.S. 327, 330-31 (1986);

Davidson v. Cannon, 474 U.S. 344, 348 (1986) ("As we held in Daniels, the protections

of the Due Process Clause, whether procedural or substantive, are just not triggered by

lack of due care by prison officials."). A complaint that a physician has been negligent "in

diagnosing or treating a medical condition does not state a valid claim of medical

mistreatment under the Eighth Amendment." Bingham v. Thomas, 654 F.3d 1171, 1176

(11th Cir. 2011) (quotation marks and citation omitted). Moreover, the Eleventh Circuit

has noted that "[n]othing in our case law would derive a constitutional deprivation from a

prison physician's failure to subordinate his own professional judgment to that of another

doctor; to the contrary, it is well established that 'a simple difference in medical opinion'

does not constitute deliberate indifference." Bismark v. Fisher, 213 F. App'x 892, 897

(11th Cir. 2007) (quoting Waldrop, 871 F.2d at 1033). Similarly, "the question of whether

governmental actors should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment." Adams v. Poag, 61 F.3d 1537, 1545 (11th Cir. 1995) (citation omitted).

## V.   Analysis and Conclusions

### A.   Counts One and Three - Deliberate Indifference

In the Motion, Corizon argues that it does not have a policy, custom, or practice of limiting authority to make hospital transfers to only physicians or avoiding hospital visits to save money. Motion at 14. Corizon maintains that any of its employees can order a patient to be sent to the hospital in an emergency and contends the facts of this case demonstrate this fact. Id. According to Corizon, the physician was called for initial orders at 3:56 a.m. Id. Thereafter, at 4:08 a.m., Jackson became unresponsive and nurses made the call to send Jackson to the hospital at 4:14 a.m. Id. Thus, Corizon argues that the record in this case refutes Jackson's contention that it had a policy giving only physicians the authority to transfer a patient to a hospital. Id. 14-15. In his Response, Jackson maintains that Corizon did have a policy that granted the authority to order hospital transfer only to physicians and to avoid hospital visits to save money. Response at 9-10. As evidence in support of this claim that this policy exists, Jackson alleges that Lewis told him that was the reason why she did not immediately call for an ambulance. Id. Jackson also submitted his own affidavit representing that Lewis told him the same. Resp. Ex. O.

Corizon contracted with the Florida Department of Corrections to provide medical services to inmates within the state of Florida. Although Corizon is not a governmental entity, "[w]here a function which is traditionally the exclusive prerogative of the state … is

performed by a private entity, state action is present" for purposes of § 1983. <u>Ancata v. Prison Health Servs., Inc.</u>, 769 F.2d 700, 703 (11th Cir. 1985) (citations omitted). Indeed,

> "when a private entity . . . contracts with a county to provide medical services to inmates, it performs a function traditionally within the exclusive prerogative of the state" and "becomes the functional equivalent of the municipality" under section 1983. <u>Buckner v. Toro</u>, 116 F.3d 450, 452 (11th Cir. 1997). "[L]iability under § 1983 may not be based on the doctrine of respondeat superior." <u>Grech v. Clayton Cnty., Ga.</u>, 335 F.3d 1326, 1329 (11th Cir. 2003) (en banc).

<u>Craig v. Floyd Cty., Ga.</u>, 643 F.3d 1306, 1310 (11th Cir. 2011); <u>see</u> <u>Denham v. Corizon Health, Inc.</u>, Case No. 6:13-cv-1425-Orl-40KRS, 2015 WL 3509294, at *3 n.1 (M.D. Fla. June 4, 2015) ("[W]hen a government function is performed by a private entity like Corizon, the private entity is treated as the functional equivalent of the government for which it works.") (citation omitted), <u>aff'd</u> (11th Cir. Jan. 13, 2017).

Where a deliberate indifference medical claim is brought against an entity, such as Corizon, based upon its functional equivalence to a government entity, the assertion of a constitutional violation is merely the first hurdle in a plaintiff's case. This is so because liability for constitutional deprivations under § 1983 cannot be based on the theory of respondeat superior. <u>Craig</u>, 643 F.3d at 1310 (quoting <u>Grech v. Clayton Cty., Ga.</u>, 335 F.3d 1326, 1329 (11th Cir. 2003) (en banc)); <u>see</u> <u>Denno v. Sch. Bd. Of Volusia Cty.</u>, 218 F.3d 1267, 1276 (11th Cir. 2000). Instead, a government entity may be liable in a § 1983 action "only where the [government entity] <u>itself</u> causes the constitutional violation at issue." <u>Cook ex. rel. Estate of Tessier v. Sheriff of Monroe Cty., Fla.</u>, 402 F.3d 1092, 1116 (11th Cir. 2005) (citations omitted). Thus, a plaintiff must establish that an official policy or custom of the government entity was the "moving force" behind the alleged

constitutional deprivation. See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 693-94 (1978).

In Monell, the Supreme Court held that local governments can be held liable for constitutional torts caused by official policies. However, such liability is limited to "acts which the [government entity] has officially sanctioned or ordered." Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (1986). Under the directives of Monell, a plaintiff also must allege that the constitutional deprivation was the result of "an official government policy, the actions of an official fairly deemed to represent government policy, or a custom or practice so pervasive and well-settled that it assumes the force of law." Denno, 218 F.3d at 1276 (citations omitted); see Hoefling v. City of Miami, 811 F.3d 1271, 1279 (11th Cir. 2016) (stating Monell "is meant to limit § 1983 liability to 'acts which the municipality has officially sanctioned or ordered'"; adding that "[t]here are, however, several different ways of establishing municipal liability under § 1983").

"A policy is a decision that is officially adopted by the [government entity] or created by an official of such rank that he or she could be said to be acting on behalf of the [government entity]." Sewell v. Town of Lake Hamilton, 117 F.3d 488, 489 (11th Cir. 1997) (citation omitted). The policy requirement is designed to "'distinguish acts of the [government entity] from acts of employees of the [government entity], and thereby make clear that [governmental] liability is limited to action for which the [government entity] is actually responsible.'" Grech, 335 F.3d at 1329 n.5 (quotation and citation omitted). Indeed, governmental liability arises under § 1983 only where "'a deliberate choice to follow a course of action is made from among various alternatives'" by governmental policymakers. City of Canton v. Harris, 489 U.S. 378, 389 (1989) (quoting Pembaur, 475

U.S. at 483-84). A government entity rarely will have an officially-adopted policy that permits a particular constitutional violation, therefore, in order to state a cause of action for damages under § 1983, most plaintiffs must demonstrate that the government entity has a custom or practice of permitting the violation. See Grech, 335 F.3d at 1330; McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004). A custom is an act "that has not been formally approved by an appropriate decisionmaker," but that is "so widespread as to have the force of law." Bd. Of Cty. Comm'rs of Bryan Cty., Okla. v. Brown, 520 U.S. 397, 404 (1997) (citation omitted). The Eleventh Circuit has defined "custom" as "a practice that is so settled and permanent that it takes on the force of law" or a "persistent and wide-spread practice." Sewell, 117 F.3d at 489. Last, "[t]o hold the [government entity] liable, there must be 'a direct causal link between [its] policy or custom and the alleged constitutional deprivation.'" Snow ex rel. Snow v. City of Citronelle, 420 F.3d 1262, 1271 (11th Cir. 2005) (quotation omitted). Because Corizon's liability under § 1983 would be based on its functional equivalence to the government entity responsible for providing medical care and services to FDOC inmates, Jackson must establish that an official policy or a custom or practice of Corizon was the moving force behind the alleged federal constitutional violation.

According to the medical records the parties provided, Jackson was brought to the infirmary at 3:33 a.m. because of an asthma attack, nurses examined him at 3:37 a.m. and administered solumedrol and duo nebulizer, nurses called Dr. Gonzalez at 3:56 a.m., Jackson became unresponsive at approximately 4:08 a.m., and medical staff called 911 for an ambulance at 4:13 a.m. Mot. Ex. A; Resp. Ex. B. Jackson attached to both the Complaint, Doc. 54-3, and the Response, Resp. Ex. A, a copy of the Prehospital Care

Report Summary for June 27, 2015, that documents the arrival of the ambulance and the care paramedics provided him. According to this document, Lifeguard Ambulance of Columbia County received a call for service at 4:14 a.m. Doc. 54-3; Resp. Ex. A.

Jackson states in his verified Second Amended Complaint that he became unresponsive twice, once at 3:33 a.m. and a second time at 4:08 a.m. Second Amended Complaint at 7-9. However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007). As such, the Court finds that there is no genuine issue of facts as to the time frames documented in the medical reports and, therefore, the approximate six-minute delay in calling an ambulance does not support a constitutional violation. See Nam Dang by and through Vina Dang v. Sheriff, Seminole County Florida, 871 F.3d 1272, 1283 (11th Cir. 2017) (finding fifteen-minute delay in transferring inmate to emergency room was not a constitutional violation).

Even assuming Jackson did become unresponsive at 3:33 a.m., the allegations in the Second Amended Complaint demonstrate that he received treatment and CPR, albeit not from Lewis, and was ultimately transferred to a hospital with an emergency room. Jackson's allegations concerning Lewis panicking when he became unresponsive demonstrate, at best, negligence on her part not a conscious disregard for Jackson's medical condition, which is insufficient to establish an Eighth Amendment violation. See Daniels, 474 U.S. at 330-31; Davidson, 474 U.S. at 348. Additionally, even if Jackson could demonstrate Lewis was deliberately indifferent, this would not make Corizon liable for her actions. Instead, Jackson must prove that Corizon's alleged policy or custom to

only allow physicians to authorize outside hospital care and only if all other cheaper means have been tried was the "moving force" behind the alleged constitutional deprivation.

Corizon's answers to Jackson's interrogatories reflect that in an emergency, all medical staff can send prisoners to hospitals for emergency care. Mot. Ex. B at 3. Of specific import to this case is one of the medical documents both parties rely on in support of their arguments, a completed Florida Department of Corrections Health Information Summary for Emergency Transfer to Outside Hospital form. Mot. Ex. A; Resp. Ex. B. Near the top of the form is an instruction that reads "If assessment is performed by health staff other than clinician, form must be reviewed and signed by a clinician on the next working day." Mot. Ex. A; Resp. Ex. B. Nurse Shiver, not a physician, completed this form which authorized Jackson's transfer to an outside hospital. The record reflects that within about six minutes of Jackson losing consciousness, a nurse called for an ambulance to transfer Jackson to an outside hospital. Thus, not only do the unrebutted events as documented in the medical records refute Jackson's contention that Corizon had a policy authorizing only physicians to order hospital transfers, the form itself does as well. This is so because the form specifically provides for the circumstance in which health staff <u>other than a clinician</u> authorize the transfer of an inmate to an outside hospital. This record demonstrates that Corizon does allow nonphysicians to authorize emergency transfers; thus, refuting Jackson's allegation concerning the existence of a policy or custom authorizing only physicians to transfer patients.

As evidence in support of Corizon's alleged policy or custom regarding cost-cutting, Jackson relies on the declaration and deposition of Charles Pugh, M.D., from a

civil case in a federal district court in Oregon as evidence of the existence of such a policy or custom. Resp. Exs. P; Q. These documents reflect that Pugh was a licensed physician who served as Corizon's Site Medical Director at the Chatham County Jail in Savannah, Georgia from 2013 through 2014. Resp. Ex. P at 1. Pugh stated that during his tenure as Site Medical Director, he felt pressure from Corizon superiors "to minimize emergency room treatments and outside physician consults for jail inmates in order to save money." Id. at 2. The Court finds Pugh's declaration and deposition testimony unavailing. Pugh worked at a different prison during a time period prior to the events in this case; therefore, Pugh's statements are not relevant to the issues in this case and only speculation links the two. However, speculation is insufficient to defeat summary judgment. See Cordoba v. Dillard's, Inc., 419 F.3d 1169, 1181 (11th Cir. 2005) (quoting Hedberg v. Ind. Bell Tel. Co., 47 F.3d 928, 931-32 (7th Cir. 1995)) ("'Speculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment.'") (emphasis in original).

Jackson also relies on Lewis' alleged statement to Jackson that:

> [T]he reason why I did not immediately send you to the emergency room when you went into respiratory failure, because [sic] we are instructed to find alternative treatment options that is [sic] cost efficient than to send an inmate to an outside hospital and if there's no other options available to contact the on-call physician for approval to send an inmate to the hospital.

Response at 4. The Eleventh Circuit has recently explained that "the Eighth Amendment does not prohibit prison officials from considering cost in determining what type (or level) of medical care inmates should receive." Hoffer v. Sec'y, Fla. Dep't of Corr., 973 F.3d 1263, 1277 (11th Cir. 2020). However, "if a particular course of treatment is indeed

essential to 'minimally adequate care,' prison authorities can't plead poverty as an excuse for refusing to provide it." Id. Here, the record undisputedly demonstrates that Jackson received at least minimally adequate medical care.[2] Corrections officers were able to get Jackson to the infirmary in a timely manner to treat his asthma attack, where he received two different forms of treatment. Once Jackson became unresponsive, CPR was administered, and an emergency ambulance was called. Even assuming Corizon had a cost-savings policy of the type Jackson alleges, based on this record, it cannot be said that such a cost-savings policy prevented Jackson from receiving minimally adequate medical care.

As such, Jackson has failed to provide any evidence to support the existence of the alleged custom, policy, or practice that only physicians can order hospital transfers or that hospital transfers are discouraged in order to save money. Indeed, as explained above, the record Jackson relies on demonstrates otherwise. Therefore, Jackson has failed to demonstrate a genuine issue of material fact with respect to any such custom or policy exists and thus, Corizon cannot be held liable for an Eighth Amendment deliberate indifference claim. Accordingly, the Motion is due to be granted as to Counts One and Three.

### B.      Count Two - Failure to Train

As to Jackson's failure to train claim set forth in Count Two, Corizon argues that other than his own legal conclusions, Jackson has not provided any evidence that Corizon

---

[2] The Eleventh Circuit has repeatedly emphasized that "minimally adequate care" is "quite minimal" under the Eighth Amendment. See Hoffer, 973 F.3d at 1277; see also Harris, 941 F.2d at 1510 (quoting Brown v. Beck, 481 F. Supp. 723, 726 (S.D. Ga. 1980)) (recognizing that medical are is not constitutionally required to be "'perfect, the best obtainable, or even very good.'").

was actually aware that Lewis or Shriver needed training on how to send inmates to the hospital. Motion at 16. According to Corizon, Jackson's allegations in the Second Amended Complaint demonstrate that Lewis panicked, and the medical records establish that a nurse authorized Jackson's transport to the hospital for additional treatment, neither of which suggests Corizon failed to properly train Lewis. Id. In his Response, Jackson contends that Corizon failed to improve its training regarding transferring a patient to an outside hospital even though Corizon is facing more than 660 lawsuits across the country alleging that it has failed to provide medical care at prisons. Response at 11-13. Jackson maintains that Lewis did not complete the training concerning emergency transfers to outside hospitals, had several complaints against her for failing to assist during an emergency, and previously had her employment terminated at a different prison. Id. at 13.

In some circumstances, "the failure to provide proper training may fairly be said to represent a policy for which the city may be held liable if it actually causes injury." City of Canton, 489 U.S. at 390. However, the Supreme Court has instructed that a failure to train can lead to municipal liability "only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants [such that the failure to train] can be properly thought of as a city 'policy or custom' that is actionable under § 1983." Id. at 388-89 (alteration added). Because Corizon is treated as the government entity responsible for the care of FDOC inmates, in order to prevail on a failure to train claim, Jackson must establish that "[Corizon] inadequately trains or supervises its employees, this failure to train or supervise is a [Corizon] policy, and that [Corizon] policy causes the employees to violate [an inmate's]

constitutional rights." Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir. 1998). To do

so, he must "present some evidence that [Corizon] knew of a need to train and/or

supervise in a particular area and [Corizon] made a deliberate choice not to take any

action." Id. The Eleventh Circuit has repeatedly held that "without notice of a need to train

or supervise in a particular area, a [government entity] is not liable as a matter of law for

any failure to train or supervise." Id. at 1351. Indeed, "the need for such training must be

plainly obvious to [the government entity's] decisionmakers," such as where there is

"evidence of a history of widespread prior abuse." Wright v. Sheppard, 919 F.2d 665, 674

(11th Cir. 1990) (alteration added); see also Rocker v. City of Ocala, Fla., 355 F. App'x

312, 314 (11th Cir. 2009) (per curiam).[3]

   As discussed above, the Court finds that Jackson has failed to establish that the

medical care he received amounted to a constitutional violation. Instead, Jackson's

allegations at best form a cause of action for negligence or medical malpractice against

Lewis, which is insufficient to establish an Eighth Amendment violation. Because there is

no underlying constitutional violation, Corizon cannot be liable for failing to properly train

its nurses. See City of Canton, 489 U.S. at 390. Additionally, not only has Jackson failed

to prove an existence of a policy or custom preventing non physicians from authorizing

---

[3] The Court notes that the Supreme Court, in dictum, has left open the possibility that "a need to train could be 'so obvious,'" that a government entity could be held liable even without a pattern of prior constitutional violations. See Gold, 151 F.3d at 1352 (citing City of Canton, 489 U.S. at 390, 109 S. Ct. at 1205). The Supreme Court offered the example of the need to train officers in the use of deadly force where the officers are provided firearms. City of Canton, 489 U.S. at 390 n.10, 109 S. Ct. at 1205 n.10. Because an "obvious need" claim "must be based on a 'particular glaring omission in a training regimen' and not merely on 'possible imperfections' in a training program," the Court finds that the record here does not contain evidence to sustain a failure to train claim based on this theory. See West v. Tillman, 496 F.3d 1321, 1331 n.16 (11th Cir. 2007) (quoting Gold, 151 F.3d at 1352).

outside hospital transfers but he has failed to demonstrate that Corizon had a policy to inadequately train its employees concerning emergency transfers to outside hospitals. While Jackson has cited generally to other prison litigation in which Corizon is involved, he has failed to present any evidence that Corizon knew there was a need to train its employees on how to initiate emergency inmate transfers to outside hospitals. Given, Jackson's failure to establish that Corizon was on notice of the need to train its employees on this specific issue, Corizon cannot be liable for a failure to train Lewis. See Gold, 151 F.3d at 1351. In fact, Jackson's exhibit, Resp. Ex. D, which purports to show that Lewis did not complete emergency hospital transfer training cuts against his claim. Although for whatever reason Lewis may have failed to complete the training, the fact that Corizon provided the training at all demonstrates that Corizon had a policy to train its employees on emergency transport procedures. Based on Jackson's failure to establish the existence of a custom or policy, Corizon's Motion is due to be granted as to Count Two.

### C.      Counts Four, Five, and Six - State Law Claims

Because all of Jackson's federal claims are due to be dismissed and the Court has no basis to exercise diversity jurisdiction, the Court declines to exercise supplemental jurisdiction over his pendant state claims. See Raney v. Allstate Ins. Co., 370 F.3d 1086, 1088-89 (11th Cir. 2004) (noting that districts courts are encouraged "to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial."). Accordingly, Counts Four, Five, and Six are due to be dismissed without prejudice. See id.

In consideration of the foregoing, it is now

**ORDERED**:

1.     Corizons' Motion for Summary Judgment (Doc. 61) is **GRANTED**.

2.     Counts Four, Five, and Six are **DISMISSED without prejudice.**

3.     The Clerk of Court shall enter judgment in favor of Corizon Health, Inc. as to Counts One, Two, and Three and dismissing Counts Four, Five, and Six without prejudice; terminate any pending motions; and close the file.

**DONE AND ORDERED** at Jacksonville, Florida, this 20th day of November, 2020.


MARCIA MORALES HOWARD
United States District Judge


Jax-8

C:
Troy Jackson #683942
Counsel of Record